NOTICE
Decision filed 05/17/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210397-U

NO. 5-21-0397

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 20-CF-97 |
| | ) | |
| KADEEM NOLAND, | ) | Honorable |
| | ) | Kyle Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Justices Barberis and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The defendant's argument that the trial court erred in allowing the State to introduce certified copies of his previous felony convictions at his trial after he testified about those convictions was forfeited, and the first prong of plain-error review is not applicable because the evidence at trial was not closely balanced. Thus, his conviction for first degree murder is affirmed.

¶ 2    The defendant, Kadeem Noland, appeals his conviction for first degree murder. The defendant contends that his conviction should be reversed and the matter remanded for a new trial because the circuit court of Madison County erred in allowing the State to introduce certified copies of his eight prior felony convictions to impeach his credibility after he testified about the convictions at trial. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State's prosecution of the defendant arises from the shooting death of Jason Thomas, which occurred on January 8, 2020. That night, the defendant and his codefendant, Kristine Mills, traveled to the Granite City residence that Mills shared with Thomas. While at the house, a shooting occurred that resulted in Thomas's death.

¶ 5      Before the jury trial, on May 15, 2020, the defendant filed a notice of his intent to assert an affirmative defense, *i.e.*, self-defense, because, at the time of the incident, he reasonably believed that the use of force was necessary to prevent either his death or great bodily harm. Thereafter, on March 25, 2021, the State filed a notice to introduce certified copies of the defendant's previous convictions. In the notice, the State indicated that the defendant had eight previous felony convictions and gave notice of its intention to introduce them at trial if the defendant testified. On May 11, 2021, the defendant filed an objection to the State's notice, arguing that the probative value of the convictions identified in the State's notice was far outweighed by the potential to mislead, confuse, and inflame the jury.

¶ 6      On May 12, 2021, the trial court held a pretrial hearing where the court addressed the admissibility of the certified convictions. After hearing counsels' arguments, the court found that, if the defendant was to testify, the State would be allowed to present, in rebuttal, certified copies of the defendant's previous convictions, and then the court would read them to the jury. The court noted that the defendant was not allowed to explain the circumstances surrounding the convictions and could only testify about what the convictions were for, where they occurred, and when they occurred. However, the court noted as follows: "The State's not to cross examine the defendant about his priors. [The defendant's counsel] has the right to front them. But he has to front them

in the manner that the Court just described. If he fails to do that, then the State would be allowed to correct that."

¶ 7 At trial, the following evidence was presented. Ronald Wilderness, Thomas's brother, testified that Thomas and Mills had been in a relationship for approximately 8 to 10 years and had lived together. However, in January 2020, they were not in a good place in their relationship and were arguing a lot.

¶ 8 On the night of January 8, Wilderness drove Thomas home from work; they both worked for the family cleaning business. When they arrived at the house, they saw movement inside, and Thomas immediately ran to the front door. Wilderness was parked in front of the house. Within approximately 30 seconds of Thomas entering the house and closing the door, Wilderness heard Thomas say, "hold on, wait," and then five to six consecutive gunshots. Then, after the shots were fired, he heard Mills screaming and ask something like, "what did you do." He subsequently observed Mills and a black male get into her black Monte Carlo and drive away.

¶ 9 After they left, Wilderness exited his vehicle and attempted to enter the house, but the front door was locked. However, he could see Thomas through the broken window in the front door. Thomas was lying on the floor to the right of the door, and Wilderness saw Thomas take his last breath. He called 911 and then he called Mills to let her know that he had seen her. He never saw Thomas with a gun that night, and, immediately before taking Thomas home, they had both been cleaning office buildings for work. He acknowledged that Thomas had kept firearms in the house at one point, but to Wilderness's knowledge, he never brought them to work.

¶ 10 Ashley Deckard, one of the responding officers from the Granite City Police Department, testified that the 911 call was received around 12:01 a.m. on January 9. When she arrived on the scene, she spoke with Wilderness, who was standing outside the residence. She approached the

3

front door and noticed that the window in the door was shattered and that the deadbolt was locked. However, she could see Thomas lying slumped on his back along the stairwell. Eventually, she and another officer were able to search the residence and observed various shell casings and glass. During her testimony, the State offered a photograph of Thomas, which showed him lying face-up at the bottom of the stairwell with his feet on the stairs.

¶ 11     Mills testified that she was currently in prison after pleading guilty to obstruction of justice, and the offense was in relation to the shooting. She had been in an on-and-off relationship with Thomas for eight years, and they had lived together in the Granite City house that she was buying from her father. She testified that Thomas was physically abusive, he was previously arrested for choking her, and she was sometimes scared of him. She met the defendant a few weeks before the shooting; they met at a gas station, and she gave him her phone number. She subsequently left Thomas and their home and began staying with the defendant at the Western Inn in St. Louis. She used drugs daily, including fentanyl, methamphetamine, Xanax, heroin, and marijuana. The defendant used some drugs but not as much or as often as she did.

¶ 12     Mills testified that, a few days before the shooting, Thomas received a phone call from Mills's phone while she and the defendant were having sex. Thomas confronted her and the defendant about the situation via text messages. Also, prior to the shooting, Thomas sent Mills text messages trying to get her to return home. The defendant saw the messages, was not happy about them, and had texted her that Thomas "had to go." She then communicated with Thomas on the day of the shooting to arrange an in-person conversation with him. The defendant also spoke with Thomas on the phone that day to arrange the meeting. They decided that Mills and the defendant would meet Thomas at the house after Thomas got off work that night. Thomas also asked Mills to return his .40-caliber handgun to him. Mills explained that she and the defendant

4

went to the house one night when Thomas was at work to get some of her belongings, and she took Thomas's handgun because she could not find the 9-millimeter handgun that belonged to her.

¶ 13    On the day of the shooting, Mills and the defendant did drugs together once, but she continued using drugs throughout the day. That night, she exchanged text messages with Thomas about what time he would be at the house. Even though Mills knew that Thomas was not home yet, she drove to the house with the defendant in her black Monte Carlo. The defendant had the .40-caliber handgun with him. When they arrived at the house, she attempted to enter through the back door using her key, but it would not unlock. Her key to the front door also did not work, so she threw her keys through the small window at the top of the door. The defendant then reached through the broken window to unlock the door, and they went inside. After not finding any of her belongings in the house, she became upset and texted Thomas that he was going to be evicted. He responded, "what do you mean," and she answered, "don't come back here." Thomas sent her more text messages, but she did not respond again until 12:05 a.m. when she asked him where he was at. She explained that the defendant told her to send that final message when they were getting ready to leave the house after the shooting.

¶ 14    Mills went upstairs to her bedroom, and the defendant followed her. While in the bedroom, she found a Dixie cup containing heroin pills on the nightstand. She was not surprised that the heroin was in the house as they kept drugs there all the time. She was walking toward the nightstand when she heard a gunshot. She then went into the hallway and started going down the stairs when she heard the second set of gunshots. As she came around the corner of the staircase, she saw Thomas at the bottom of the stairs close to the wall. She explained that, from the second floor, there were 4 or 5 stairs, a landing, a turn, and then 13 or 14 more stairs to get to the first floor. She also explained that her bedroom door was approximately three feet from the top stair.

5

The defendant was close to the top of the stairs, near the landing, and he was wearing her ski mask over his face. He was pointing a gun down toward Thomas and shooting. She continued down the stairs and screamed at the defendant, asking him, "What the fuck are you doing?" She then checked for Thomas's pulse, but he seemed dead, and the defendant told her not to touch Thomas. She had not heard Thomas enter the house, and she did not see him holding a gun or a gun near his body.

¶ 15    Mills then told the defendant to leave, but he said that she was coming with him. At that time, she noticed that the defendant had three guns on him: the .40-caliber handgun, a 9-millimeter handgun, and an assault rifle. Although she wanted to stay with Thomas, she left the house with the defendant because she felt like she had no choice. She then drove them back to the motel in St. Louis. When they arrived, she went into the room and took some more fentanyl. The defendant brought all three guns into the room; he had the two handguns in his waistband, and he covered the rifle with a jacket or something. When the police arrived at the motel, the defendant put the handguns in the back of the toilet and the rifle under the bed mattress. Mills attempted to break her cell phone by throwing it in the shower.

¶ 16    Mills was subsequently arrested and talked with a police detective that night. She acknowledged that she initially lied and told the detective that a masked assailant had shot Thomas. After further questioning, she changed her story and told the detective that she was there with the defendant when Thomas entered the house with a gun, fought with the defendant, and was shot by the defendant. However, she acknowledged that story was also a lie. She was initially charged with two counts of first degree murder for the incident, but she pled guilty to obstruction of justice for lying. She also had some drug-related charges that were dismissed as part of her plea deal.

6

¶ 17    Dr. Gershom Norfleet, an assistant medical examiner with the St. Louis County Medical Examiner's Office, testified that he performed the autopsy on Thomas. Dr. Norfleet explained that Thomas had an entrance wound on the left side of his neck and six other gunshot wounds throughout his body. Three of the wounds were fatal. Dr. Norfleet explained that the gunshot wound to the neck most likely occurred while Thomas was standing because the bullet's trajectory was downward and to the right traveling to the back of the body. The trajectory for the rest of the gunshot wounds were upwards to the right traveling to the back of the body. Some of the wounds were abrasions that the gunshots created and not true entrance or exit wounds, which indicated that the victim's body was lying on a solid surface as the bullets passed through the body. Also, some of the recovered bullets or fragments were deformed, meaning that the bullets traveled through the body and came to rest after striking a surface. Dr. Norfleet opined that the position that Thomas was lying in the crime scene photographs was most likely the position that he was in when these bullets passed through his body. Dr. Norfleet testified that the cause of death was gunshot wounds to the chest and abdomen and the manner of death was a homicide. Thomas testified positive for fentanyl, opiates, and cocaine metabolites at the time of death.

¶ 18    William Grant Hentze, a crime scene investigator with the Illinois State Police, testified that he arrived on the scene at approximately 4:15 a.m. on January 9. Upon arriving, he conducted a walk-through of the residence. During his walk-through, he noticed numerous discharged cartridge cases on the floor in the foyer entryway, near Thomas, and observed that the bulk of the cartridge cases had been fired in Thomas's general vicinity. He noted that there was also a cartridge case from a .40-caliber Smith & Wesson lying on the floor of the door threshold to the front upstairs bedroom and a .22-caliber shell casing on the staircase considerably above where Thomas was located. He also observed some defects in the tile flooring where it appeared to be

7

broken from a projectile; the defects were near where Thomas was lying. There were no firearms or other weapons found near Thomas. During his examination of the house, Hentze did not observe any bullet holes, fragments, or defects in the walls.

¶ 19    Nicholaus Roberts, a sergeant with the Granite City Police Department, testified that a black Chevrolet Monte Carlo was registered to Mills, and he was able to obtain the registration and license plate number for the vehicle. Based on the interviews from the witnesses at the scene, it was known which direction the vehicle went after leaving the Granite City residence. A dispatcher was then able to obtain footage from a downtown camera that showed a black car matching the description of Mills's car; the footage showed the direction the vehicle traveled when leaving town. They were also able to check license plate reader cameras and discovered that, at 12:07 a.m., the vehicle crossed the McKinley Bridge into Missouri. The license plate reader camera also showed the vehicle traveling eastbound into Illinois at approximately 11:35 p.m. on January 8.

¶ 20    Roberts also obtained Mills's cell phone number from Wilderness, and he was able to get the phone's location service information from AT&T. Officers then located the black Monte Carlo in a Western Inn parking lot that was located on North Broadway in St. Louis. The hotel manager provided them with the room number for the guests driving that car. Subsequently, the defendant exited the room, and he was taken into custody.

¶ 21    Mills was also taken into custody and interviewed. In her interview, she made comments that led the officers to believe that the firearms that had been used in the shooting were still in the motel room. During the search, multiple firearms and a black ski mask were found.

¶ 22    Detective Jeff Donahey from the Granite City Police Department testified that relevant video surveillance footage was obtained from the Western Inn, and the footage showed Mills and

the defendant leaving the motel at 10:19 p.m. on January 8. The footage also showed them returning on January 9 at 12:10 a.m., which was 19 minutes after the homicide was reported. They eventually exited the vehicle, and the defendant was carrying an item with a buffer tube, which indicated that he was carrying and concealing a rifle. A Ruger 10/22 rifle with an "AR type aftermarket platform" was found under the bed in the room. A .40-caliber handgun with the magazine out, the magazine from that handgun, and a 9-millimeter handgun were found inside the toilet tank. A ski mask was also found in the room. Once the defendant was taken into custody, he was interrogated and gave statements to the officers. A redacted version of the videotaped interview was played for the jury. This video showed the defendant denying being with Mills in Granite City that night and refuting her initial story that he shot Thomas after wrestling with Thomas.

¶ 23    Timothy Johnson's testimony was presented through the stipulation of the parties. Johnson was a forensic scientist at the Illinois State Police Metro East Forensic Science Laboratory in Belleville. According to the stipulation, Johnson examined the 13 fired cartridge casings collected from inside the Granite City residence and compared them to the three firearms found in the motel room. Ten of the fired casings were conclusively determined to have been fired from the Hi-Point .40-caliber semiautomatic pistol, two of the fired casings were conclusively determined to have been fired from the Taurus 9-millimeter Luger semiautomatic pistol, and one fired casing was conclusively determined to have been fired from the Ruger .22-caliber semiautomatic long rifle.

¶ 24    The State then rested its case, and the defendant took the stand in his own defense. However, before the defendant testified, the trial court reminded counsel about its previous ruling regarding the admissibility of the defendant's previous convictions. The court noted that the State was permitted to introduce the certified copies of eight previous convictions as rebuttal evidence,

9

and the court would then read the convictions to the jury. The court also cautioned that, although the defendant's counsel may front the convictions with the defendant during questioning, fronting the convictions would not mean that the defendant was allowed to explain them. The court noted that any extra comments by the defendant about the convictions would not be admissible.

¶ 25    The defendant then testified that, about three weeks before the shooting, he met Mills at a gas station when he sold her fentanyl. Approximately four days later, they met up and got a motel room together. During the three weeks leading up to the shooting, the defendant was having fun and partying with Mills. Mills had indicated that she was no longer staying in the house with Thomas because he was violent, and she was scared of him. About one week before the shooting, the defendant went with Mills to her Granite City house to get some of her belongings. They entered the house through the back door with Mills's key; Thomas was at work during this time. They took a .40-caliber handgun, some food, and personal items from the house.

¶ 26    The next time that the defendant went to the Granite City house was on the night of the shooting. He explained that he did not want to go with Mills to her house that night, and he only went because she did not want to go alone. He had smoked marijuana, taken some Xanax, and had been drinking alcohol that day.

¶ 27    When they arrived at the house, Mills attempted to use her key to enter through the back door, but the key would not work. Mills got angry and began texting on her cell phone. She then attempted to enter through the front door, but, when that door also would not open, she threw her keys and broke the window. The defendant then reached through the window and unlocked the door. Mills entered the house, and she immediately went upstairs. The defendant shut the door and locked it. He then grabbed a ski mask that was on a dresser by the door, explaining in his testimony that, at this point, he realized something was wrong, and he was in survival mode. He

found a rifle on the couch and brought it upstairs because he felt unsafe on the first floor. He also still had the .40-caliber handgun with him.

¶ 28     As he was walking upstairs, the defendant tripped on part of a stair, and the rifle discharged; the shell casing found on the stairs was from this discharge. Once he reached the second floor, he leaned the rifle against the wall and put the ski mask on the floor. Mills exited the bedroom after hearing the shot and asked him what happened. After he explained, she went back into the bedroom and headed toward the nightstand. The defendant did not follow her into the bedroom; instead, he stood on the threshold of the door and told her that it was time to go.

¶ 29     The defendant then heard a "crack in the step" but no one said anything, so he pulled the handgun from his waistband and waited for someone to come up the stairs. He then saw the tip of a gun and a shoulder, but he could not see the person's face. Once he saw the tip of the gun, he fired one shot at the person. He explained that he did not wait for the person to come around the corner because he was scared. After the first shot, the person disappeared, and he heard a loud thud. At that point, he did not know where the person was and thought the person might be hiding. He explained that the gun was never pointed at him, but he saw the side of the barrel that was in the person's hand.

¶ 30     The defendant then ran to the top of the stairs, turned the corner, and started shooting. The person was on his back with the gun still in his hand, and the gun was aimed up. The hand holding the gun was still moving, so the defendant continued shooting. After emptying his gun, he ran toward Thomas, kicked the gun out of Thomas's right hand, and then grabbed it. He explained that the gun was a 9-millimeter handgun and was the same gun that he had seen from around the corner at the top of the stairs. He then put the gun in his waistband, jumped over the body, and

closed the front door. As he was closing the door, he noticed a vehicle outside with the lights on. He did not know who was in the car but decided it was time to leave.

¶ 31    At this point, Mills was standing at the top of the stairs looking down at Thomas and screaming at the defendant. The defendant then jumped back over the body, ran upstairs, and grabbed the rifle and ski mask. Mills was checking Thomas's pulse when the defendant told her to leave the body alone and that it was time to leave. She was emotional and crying over the body, but he denied forcing her to leave the house. He put the ski mask on because he was concerned that the person outside would try to kill them, and he did not want that person seeing his face. They exited the house through the back door, and Mills drove them back to the motel. The defendant did not go to the house with the intention of shooting Thomas; he explained that he did not even want to meet Thomas. On the drive, he took fentanyl for the first time because he was so traumatized. He explained that he hid the firearms inside the motel room after seeing that the police were outside because he did not want them to shoot him when they saw the guns. When moving the rifle into the motel room, he wrapped it in a jacket to conceal it.

¶ 32    While in the motel room, the defendant attempted to explain to Mills what had happened, but she was high and not hearing him. He later became aware that their conversation had been recorded. In that recorded conversation, Mills asked him what she was supposed to say. He responded, "When I go, I swear to god I'm not finna [*sic*] sit for this long knowing I could have killed your ass because I feel like you, you going to crack." He also said, "I know how to beat a lot of shit, you hear me. I know how to beat a lot of shit, whether or not you snitch or not." He then slapped her, which could be heard on the recording, and later said, "your ass is an accessory to this, and I'm going to make sure that my lawyer knows it."

12

¶ 33 The defendant acknowledged that, when he initially talked with the police, he did not tell the truth in claiming that he was never in Granite City that night. He also denied Mills's initial story that he was wrestling with Thomas over a gun when the shooting occurred. He acknowledged that he wrote a letter to the state's attorney office in December 2020, in which he indicated that he did not bring the .40-caliber handgun to the house that night, and he found it upstairs. He also stated in the letter that, when Thomas came upstairs, they locked eyes, and he shot his gun out of fear.

¶ 34 The defendant also testified about his previous criminal history. The following testimony concerning his criminal history was presented:

"Q. *** [J]ust so we're clear here, I think you testified a moment ago this is not the kind of crime you would normally commit?
A. No.
Q. Or be accused of. You're presumed innocent as you sit here. And I think you said you'd gotten out of the penitentiary right before all this, correct?
A. Correct.
Q. In September of 2015 looks like on two separate offenses, September 2nd and September 22nd. On September 2nd you were convicted of Theft or Stealing, true?
A. Correct.
Q. And looks like about 19 days later you were convicted of Retail Theft subsequently?
A. Correct.
Q. Both of the cases in September of 2015, correct?
A. Correct.
Q. Then about a little over two years later in December of 2017 you had six convictions; is that correct?
A. Correct.
Q. You had Burglary, correct?
A. Correct.
Q. You had another Theft Stealing case, correct?
A. Correct.
Q. Then you had another Burglary, correct?
A. Correct.
Q. And then you had another Theft Stealing case?
A. Correct.
Q. And you had another Burglary?
A. Correct.
Q. And then you had a Theft or Stealing case?

13

A. Correct. These are all one and the same though. Those burglaries are on the same date and time, just ran into them once, just one building, just multiple offices."

¶ 35    As evidence in rebuttal, the State presented the certified copies of the defendant's previous convictions. The trial court then read those convictions to the jury and admonished the jury that it was only permitted to consider the convictions as it related to the defendant's believability as a witness and that the convictions could not be used for any other reason. Outside the presence of the jury, the court, for the record, indicated that there was a side bar during the trial proceedings because the State wanted the certified copies of the defendant's previous convictions to be read to the jury, even though the defendant's attorney fronted those convictions with his client. The court noted that, although counsel fronted some of those convictions, some of the dates and the counties or cities in which they occurred were not brought out in the testimony. Therefore, the court read the convictions to the jury.

¶ 36    After closing arguments, the trial court gave the jury several instructions, including, that any evidence that was received for a limited purpose should not be considered for any other purpose and that evidence of the defendant's previous conviction of an offense may be considered as it affected his believability as a witness and must not be considered as evidence of his guilt of this offense. The jury was also instructed on first degree murder, second degree murder, and self-defense. Thereafter, the jury found the defendant guilty of first degree murder.

¶ 37    On August 2, 2021, the trial court sentenced the defendant to 35 years' imprisonment for first degree murder and 30 years for the mandatory firearm enhancement. That same day, the defendant filed a notice of appeal.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, the defendant argues that he was denied a fair trial where the certified copies of his eight previous convictions were first introduced into evidence by the State and then read to the

14

jury by the trial court, even though he admitted to each of the offenses during his direct examination. He contends that this placed unnecessary emphasis on his convictions by having the jury hear the evidence twice. In setting forth this argument, the defendant acknowledges that he has forfeited review of this issue because he failed to contemporaneously object and raise the issue in his posttrial motion (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), but argues that we should review the issue under the first prong of the plain-error doctrine.

¶ 40    The plain-error rule is a narrow and limited exception to the general rule of forfeiture. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). Under the plain-error doctrine, a reviewing court will review an unpreserved error when a clear and obvious error occurs and: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant; or (2) the alleged error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The first step in the plain-error analysis is determining whether an error occurred. *Id*. at 565. However, we conclude that, even if an error existed, the first prong of the plain-error doctrine does not apply because the evidence was not closely balanced.

¶ 41    In determining whether the evidence adduced at trial was closely balanced, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, common sense assessment of it within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53. This inquiry involves an assessment of the evidence on the elements of the charged offense as well as any evidence regarding the witnesses' credibility. *Id*. The evidence must not only be closely balanced but must be so closely balanced that the error alone threatened to tip the scales of justice against defendant. *People v. Mueller*, 2015 IL App (5th) 130013, ¶ 25.

15

¶ 42　Here, the defendant contends that the evidence was closely balanced because the trial was a credibility contest between him and Mills, the only two witnesses with actual knowledge of the incident; Dr. Norfleet's testimony corroborated his claim that he fired the first shot toward Thomas's shoulder while Thomas was standing; much of Mills's testimony corroborated his testimony as to the events before and after the shooting; and Mills's testimony was not as credible because she accepted a plea deal in exchange for that testimony.

¶ 43　A credibility contest exists when the evidence turns on the testimony of witnesses that provide alternative versions of events, and no additional evidence is introduced to contradict or corroborate either version of events. *Naylor*, 229 Ill. 2d at 608.　In *People v. Daniel*, the evidence was found to be closely balanced where the outcome depended on two versions of events that were both plausible. *Daniel*, 2018 IL App (2d) 160018, ¶¶ 30-31.　Similarly, in *Piatkowski*, our supreme court concluded that the evidence was closely balanced where the only evidence linking defendant to the crime was the testimony of two eyewitnesses; the State had presented no physical evidence to connect defendant to the shooting, and no inculpatory statements by defendant were admitted. *Piatkowski*, 225 Ill. 2d at 567.

¶ 44　Here, unlike *Piatkowski*, the other testimony and evidence presented at trial supported the State's version of events.　Thomas had several gunshot wounds; one of which was to his neck while he was standing, and three that were fatal.　There were 10 fired shell casings discarded from the firearm used to shoot Thomas.　The defendant claimed that he first shot Thomas when Thomas was at the top of the stairs; he heard a loud thud; and despite being shot in the neck, falling down approximately 13 or 14 stairs, and coming to rest at the bottom of those stairs, Thomas held on to the gun and was aiming it up.　However, there were no bullet holes or any other defects in the walls or any blood upstairs.

16

¶ 45    The defendant also testified that he saw Thomas with a gun when he started shooting, but Hentze testified that he conducted a walk-through of the residence after the shooting and did not find a gun near Thomas's body.  Hentze did discover damaged floor tiles underneath where Thomas was lying, which were likely caused by the impact of the rounds traveling through Thomas's body and coming to rest.  This evidence was supported by Dr. Norfleet's testimony that Thomas was lying on a firm surface for most of the gunshots.  There were shell casings from all three firearms found discarded throughout the house, including from the gun that the defendant claimed that Thomas was holding, but there was no indication from the physical evidence that Thomas had shot that gun inside the house that night.  Also, Wilderness testified that Thomas did not have a gun on him when entering the house and that they had just come from work where they were cleaning office buildings.

¶ 46    After being arrested, the defendant provided two different accounts of what occurred on the night of the shooting, and both accounts differed from his testimony at trial.  He initially denied being with Mills in Granite City that night.  He then subsequently indicated that he did not bring the .40-caliber handgun with him to the house but found it upstairs, heard someone running up the stairs, turned the corner, and saw Thomas running up the stairs with a gun in hand.  He then locked eyes with Thomas, Thomas tried to aim a gun at him, and he shot at Thomas out of instinct and fear.  Then, at trial, the defendant claimed that he had not been able to see who was coming up the stairs as he only saw the person's shoulder and the side of the gun.  He also testified that a gun was never directly pointed at him.

¶ 47    Moreover, the defendant's actions following the shooting refute his claim of self-defense.  Although he claimed that Thomas was holding a gun, the defendant took that gun from the crime scene as he fled.  He also admitted to putting on a ski mask to hide his identity while he was still

17

at the house. He then fled the crime scene with the firearms and returned to St. Louis. Once there, he hid the weapons inside his motel room; he hid the two handguns in the toilet tank, which included the one that he claimed Thomas had been holding, and he hid the rifle under the mattress.

¶ 48     At this time, the defendant also had a conversation with Mills, which was recorded, where he told her that he was going to tell his attorney that she was an accessory to what just occurred. He also made the following threatening comment to her: "When I go, I swear to god I'm not finna [*sic*] sit for this long knowing I could have killed your ass because I feel like you, you going to crack." He further said, "I know how to beat a lot of shit, you hear me. I know how to beat a lot of shit, whether or not you snitch or not." Viewing the evidence in a common sense manner in the context of the totality of the circumstances, we find that the evidence in this case was not closely balanced. Thus, we conclude that the first prong of plain-error review is not warranted.

¶ 49                                   III. CONCLUSION

¶ 50     For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.


¶ 51     Affirmed.