NOTICE

Decision filed 07/24/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240959-U

NO. 5-24-0959

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 20-CF-97 |
| | ) | |
| KADEEM NOLAND, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: We grant appellate counsel's motion to withdraw and affirm the circuit court's dismissal of defendant's postconviction petition where the issues were contradicted by the record or otherwise lacked merit.

¶ 2    Defendant, Kadeem Noland, appeals the circuit court's order dismissing his postconviction petition. His appointed appellate counsel, the Office of the State Appellate Defender (OSAD), concluded there was no reasonably meritorious argument that the circuit court erred in doing so. Accordingly, OSAD filed a motion for leave to withdraw as counsel on appeal and a supporting memorandum. See *Pennsylvania v. Finley*, 481 U.S. 551 (1987). OSAD notified defendant of its motion. This court provided defendant with an opportunity to respond, and he filed a response. After considering the record on appeal, OSAD's motion and supporting memorandum, along with

1

defendant's response, we agree that no meritorious argument could be presented for the proposed issues. Accordingly, we grant OSAD leave to withdraw and affirm the circuit court's judgment.

¶ 3                                             BACKGROUND

¶ 4     Defendant was charged with first degree murder in the shooting death of Jason Thomas in Granite City on January 8, 2020. Almost immediately, tension developed between defendant and his special public defender, Steve Griffin. The tension led defendant to file a motion to discharge Griffin and proceed *pro se*. During the COVID-19 pandemic, the circuit court was unable to hear the motion and defendant sent multiple letters to the circuit court reiterating his desire to proceed *pro se*. Griffin also moved to withdraw. By the time defendant's motion was called for hearing, defendant and Griffin had apparently patched up their differences and the following colloquy occurred:

"THE COURT: Did you talk with [counsel] today?

DEFENDANT NOLAND: Yes.

THE COURT: Okay. And after talking with Mr. Griffin today are you still wanting to proceed on your Motion to Proceed *[p]ro se*?

DEFENDANT NOLAND: No, ma'am.

THE COURT: So at this time you are wanting to withdraw your Motion to Proceed *pro se* and you would like to keep Mr. Griffin?

DEFENDANT NOLAND: Yes, ma'am."

¶ 5     This spirit of cooperation was short-lived, as defendant complained about Griffin to the Attorney Registration and Disciplinary Commission (ARDC). Although the ARDC closed the case without requiring a response from Griffin, he again moved to withdraw, contending that communication with defendant was irretrievably broken. At the hearing, Griffin noted a concern

for his personal safety, given defendant's constant complaints about him and that defendant had recently been found in possession of a shank. Griffin told the circuit court that he had not touched defendant's file since the ARDC complaint was filed but assured the circuit court that he would put forth his best effort on defendant's case if he were not allowed to withdraw.

¶ 6 The circuit court denied Griffin's motion to withdraw, explaining to defendant:

"If I allowed every attorney to withdraw because of being turned in to the ARDC it would create absolute chaos in this county, because every defendant when they don't like their public defender or special defender would then just turn around and turn their attorney in[ ]to the ARDC, and then now they think they're going to get a new attorney. And it would be absolute chaos for this county and for the movement of any cases."

Defendant explained that he wanted more access to his attorney. He did not indicate a desire to proceed *pro se* at that time.

¶ 7 Evidence at trial showed that defendant took Kristine Mills to a home she previously shared with Jason, the victim in this case. On the day of the incident, Kristine returned to the house to retrieve some of her belongings. Ronald Wilderness drove Jason home from work and when they arrived they saw movement in the house. Jason exited the car and entered the house. Approximately 30 seconds later, Ronald heard Jason say, "hold on, wait" followed by five or six gunshots. He then heard Kristine yell, "oh my God" and "what did you do." After that there was a lot of screaming. Ronald entered the house and saw Jason lying near the front door.

¶ 8 Kristine acknowledged that, after the shooting, she pled guilty to obstruction of justice in exchange for a six-year prison term. She also admitted using fentanyl since 2007. She lived with Jason in a house she was buying from her father. Kristine testified that during her eight-year

3

relationship with Jason, he physically abused her and cheated on her, specially noting that a few years prior, Jason was arrested for choking her. She agreed that she paid his bail despite being "pretty scared" of him. She stated that they broke up a few weeks before the shooting and Jason was still living in the house at the time of the shooting.

¶ 9    Kristine met defendant in December 2019, and on January 8, 2020, Kristine arranged to meet Jason at the house. She and defendant drove from St. Louis to Granite City. When they arrived, Kristine discovered that Jason had changed the locks which made her angry. No one was home at the time, so Kristine and defendant entered the home after breaking a window. She then called Jason and told him not to come to the house.

¶ 10   Kristine went upstairs to the bedroom and found a cup filled with heroin pills on the dresser. Defendant followed her. She heard a gunshot. She heard a second set of gunshots, then saw Jason lying on the floor inside the front door. Defendant was at the top of the stairs pointing a gun down toward Jason. Kristine ran down the stairs and checked for Jason's pulse. She denied seeing a gun in Jason's hand or near his body. Kristine and defendant left quickly and drove back to St. Louis.

¶ 11   Forensic pathologist Dr. Gershon Norfleet testified that Jason was shot nine times. All the gunshot wounds had an upward trajectory except one neck wound. Abrasions on Jason's skin showed that he was lying down when he was shot.

¶ 12   Defendant testified and admitted he had eight prior convictions. He said that he and Kristine drove to the house on the night of the shooting. She did not want to go by herself because she thought Jason would steal her car if she went alone. When they entered the house, defendant, who had a handgun in his waistband, saw a .22-caliber rifle on the couch. He started upstairs with the rifle, which accidentally went off as he was walking. While upstairs, he heard a crack on the steps and pulled out the handgun. He saw the barrel of a gun and a shoulder and started shooting.

¶ 13    Defendant testified that he was scared. He heard a thud, then went to the top of the stairs and continued shooting. He saw Jason lying on his back, with a gun in his right hand aimed upward. He ran down to Jason, kicked the gun away from him, picked it up, and put it in his waistband.

¶ 14    The jury was instructed on self-defense and second degree murder based on an unreasonable belief in the need for self-defense. The jury also asked two questions during deliberations. The first was in two parts and asked, "Was the bullet from the neck wound recovered? If so, where?" The second question asked, "Was there actually bleach in the back of [the] toilet tank?" The parties agreed that the answer to both should be, "You have received all the evidence in this case and should continue your deliberations" because the "testimony was the testimony" and "there was no testimony about whether there was or not bleach in the back of the toilet tank." Following further deliberations, the jury found defendant guilty of first degree murder. The circuit court denied defendant's posttrial motion and sentenced him to 65 years' imprisonment.

¶ 15    Defendant subsequently filed a *pro se* motion alleging that trial counsel was ineffective for not investigating the case or presenting available defenses. Defendant noted that Griffin moved to withdraw after defendant filed the ARDC complaint and admitted that he stopped working on the case at that point. Defendant's motion also alleged that there was a witness that trial counsel should have interviewed who did not hear anything on the night of the shooting but heard Jason fire a gun on New Year's Eve, that counsel failed to object when the prosecutor argued that he was standing at the bottom of the steps when he shot Jason when the firearms evidence indicated he was at the top of the stairs, and that counsel should have objected to the State presenting a redacted version of his interrogation video.

5

¶ 16    The circuit court conducted a preliminary *Krankel*[1] inquiry, during which defendant elaborated on his claims. As examples of counsel's deficient performance, defendant highlighted several instances in which the circuit court denied counsel's objections. He also criticized counsel's failure to challenge the evidence related to the shooting, alleging that the jury asked during deliberations "if the victim got shot on the top of the steps would *** there would have been found a bullet somewhere near the top of the steps that came from the victim's neck." He further complained about the edited version of the police interrogation, stating that he never agreed to that version being played, he never picked the jury, and he was never given a plea offer.

¶ 17    After hearing trial counsel's responses, the circuit court denied the motion. It noted that defendant withdrew his motion to proceed *pro se*, representing that he still wanted Griffin to represent him, and that during the hearing on Griffin's second motion to withdraw, Griffin assured the circuit court that he could still represent defendant.

¶ 18    On direct appeal, we rejected defendant's argument that the circuit court erred in allowing him to be impeached with his prior convictions. *People v. Noland*, 2023 IL App (5th) 210397-U. In so doing, we noted that the evidence was not closely balanced. *Id.* ¶ 40.

¶ 19    Defendant then filed a *pro se* postconviction petition listing six issues. The first issue alleged ineffective assistance of appellate counsel for failing to raise trial counsel's ineffectiveness in the direct appeal. He alleged that appellate counsel should have argued that trial counsel was ineffective for failing to call a ballistics or DNA expert, asserting that the jury had asked "if [Jason] did get shot on the top of the staircase would there be blood on the walls." Defendant argued that an expert would have supported his claim that the gunshot wound to the neck, which the forensic

---

[1] *People v. Krankel*, 102 Ill. 2d 181 (1984), requires the circuit court to conduct a preliminary inquiry into a defendant's *pro se* allegations that counsel was ineffective.

pathologist described as having a downward trajectory, could have only happened when Jason was "in transition," as defendant told the jury. The second issue alleged defendant was denied his right to represent himself or obtain new appointed counsel, noting that he requested to proceed *pro se* and that counsel's motion to withdraw was denied. The third issue alleged that trial counsel failed to utilize available impeachment evidence because Ronald testified that he could hear Jason say, "hold on, wait," but Kristine never testified to hearing Jason say anything, which "created perjury." The remaining three issues also alleged that trial counsel was ineffective for failing to communicate a plea offer, not raising a speedy trial claim, and not raising a defense of mutual combat.

¶ 20     The circuit court dismissed the petition finding it frivolous and patently without merit. As to the first issue, the circuit court found the claim conclusory. It noted that the jury did not ask any question about blood splatter and found the claim was based on inaccurate facts with no support for what the expert in ballistics or DNA evidence would have revealed. As to the second issue addressing defendant's motion to proceed *pro se*, the circuit court found that defendant's argument was contradicted by the record. The third issue involved the alleged perjury, and the circuit court found that defendant's allegations failed to support the claim. As the fourth claim related to a plea offer, the circuit court noted there was no evidence of any plea offer, and defendant had no constitutional right to one. The fifth claim involving speedy trial was found meritless because defendant was tried within the speedy-trial term. Finally, the circuit court found no facts supporting defendant's sixth claim involving mutual combat. Defendant appeals.

¶ 21                                    ANALYSIS

¶ 22    OSAD concludes there is no reasonably meritorious argument that the circuit court erred in summarily dismissing defendant's petition, given that its allegations were either contradicted by the record or speculative. We agree.

¶ 23    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)) provides a mechanism by which a criminal defendant may assert that his conviction resulted from a substantial denial of his constitutional rights. *Id.* § 122-1(a); *People v. Delton*, 227 Ill. 2d 247, 253 (2008). To survive summary dismissal, a petition must present "the gist of a constitutional claim." *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). Failure to meet that burden will allow a court to summarily dismiss the petition "as frivolous or patently without merit," which is consistent with a finding that the "petition has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). Limited detail is sufficient and well-pled allegations are taken as true and liberally construed. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). Our review of the circuit court's summary dismissal is *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 387-88 (1998).

¶ 24    Defendant's petition first claimed that his appellate counsel was ineffective for failing to raise claims regarding trial counsel's ineffectiveness. To establish that a defendant was deprived of the effective assistance of counsel, he must show both that his attorney's performance was deficient and that he suffered prejudice as a result. *People v. Manning*, 227 Ill. 2d 403, 412 (2008) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Claims of ineffective assistance of appellate counsel are governed under the same standard. *People v. Johnson*, 206 Ill. 2d 348, 378 (2002). To succeed on such a claim at the first stage of postconviction proceedings, a defendant must establish that it is arguable that (1) his appellate counsel's performance was objectively

8

unreasonable and that (2) but for appellate counsel's errors, there is a reasonable probability that the appeal would have succeeded. *People v. Delgado*, 2022 IL App (2d) 210008, ¶ 26.

¶ 25     Here, defendant claims that trial counsel was ineffective for failing to call a firearms expert or DNA expert based on the jury question and, therefore, appellate counsel was ineffective for failing to raise this as an issue on direct appeal. However, as noted by the circuit court, defendant's first claim was premised on faulty facts. While the jury asked two questions, neither had anything to do with blood splatter; one asked if a bullet was found and the other asked about bleach in the toilet bowl. Accordingly, we agree that this claim has no merit.

¶ 26     Defendant's second claim fares no better. "A defendant has a constitutional right to represent himself." *People v. Baez*, 241 Ill. 2d 44, 115 (2011) (citing *Faretta v. California*, 422 U.S. 806, 835 (1975)). A "waiver of counsel must be clear and unequivocal, not ambiguous." *Id.* at 116. "A defendant waives his right to self-representation unless he ' "articulately and unmistakably demands to proceed *pro se*." ' " *Id.* (quoting *People v. Burton*, 184 Ill. 2d 1, 22 (1998), quoting *United States v. Weisz*, 718 F.2d 413, 426 (D.C. Cir. 1983)). Here, when defendant's motion to proceed *pro se* was called for hearing, he withdrew the motion and expressly stated that he wanted to continue with Griffin's representation.

¶ 27     In his response, defendant argues that he should have been appointed new counsel. He notes that Griffin admitted at the second hearing that he did not work on defendant's case after the ARDC complaint and Griffin's second motion to withdraw alleged that the attorney-client relationship had deteriorated beyond repair, arguing that "that alone is ineffective assistance of counsel." We disagree.

¶ 28     First, defendant never requested a new attorney after Griffin's motion to withdraw was denied. We note, however, that even if defendant presented a later request for new counsel, a denial

9

might not rise to the level of a constitutional claim. "The constitutional right to appointed counsel does not allow an indigent defendant to pick his appointed counsel." *People v. Adams*, 195 Ill. App. 3d 870, 872 (1990).

¶ 29    Second, defendant's argument is contrary to law. " '[A] *per se* conflict of interest is *not* created simply because the defendant claims that his representation was ineffective or because, as was done here, he files a complaint with the ARDC alleging the same.' " (Emphasis in original.) *People v. Levesque*, 256 Ill. App. 3d 639, 649 (1993) (quoting *People v. Jackson*, 243 Ill. App. 3d 1026, 1033 (1993)). Thus, defendant's assertion that he established some type of *per se* ineffective assistance claim is simply incorrect.

¶ 30    Here, as noted by the circuit court, while there were issues of tension prior to trial, when questioned by the circuit court, defendant only stated that he wanted more contact with the current attorney and no further complaints were noted after trial counsel's motion to withdraw was denied until posttrial. Accordingly, we agree that the record contradicts defendant's claim.

¶ 31    Defendant's third claim—that counsel should have exploited in some unspecified fashion the alleged discrepancy between Ronald testifying that he heard Jason say something, but Kristine heard nothing—is equally unavailing as there is no discrepancy. Different testimony from witnesses does not prove that either witness committed perjury. See *People v. Wills*, 71 Ill. 2d 138, 145 (1978) (defining perjury as a person under oath who "makes a false statement, material to the issue or point in question, which he does not believe to be true" (internal quotation marks omitted)). Nothing in the evidence reveals that either witness believed they were providing perjured testimony. The petition contended that it was implausible that Ronald, who remained in the car, could hear Jason while Kristine, who was inside the house, could not. However, Ronald never explicitly stated that he remained in the car after Jason entered the house and his testimony revealed

10

he did enter the house and found Jason's body by the door. Accordingly, we agree that falsity of testimony was insufficiently alleged.

¶ 32    Defendant's fourth contention was that counsel was ineffective for failing to communicate a plea offer. "Defense counsel has a duty to communicate to the defendant 'formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused.' " *People v. Ryburn*, 2019 IL App (4th) 170779, ¶ 41 (quoting *Missouri v. Frye*, 566 U.S. 134, 145 (2012)). Counsel's failure to convey a plea offer before it expires may be deficient performance under *Strickland. Id.*

¶ 33    However, as noted by the circuit court, the record contains no evidence that the State ever made a formal offer that counsel failed to communicate. A postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2024). The absence of any evidence that the State made a formal plea offer thus defeats this claim. See *People v. Delton*, 227 Ill. 2d 247, 255 (2008) ("the failure to either attach the necessary affidavits, records, or other evidence or explain their absence is fatal to a post-conviction petition [citation] and by itself justifies the petition's summary dismissal" (internal quotation marks omitted)).

¶ 34    Defendant's fifth claim contended that defense counsel was ineffective for failing to assert defendant's right to a speedy trial. A defendant in custody must be tried within 120 days from the date he or she was taken into custody unless he is responsible for the delay. *People v. Yankaway*, 2025 IL 130207, ¶ 69 (citing 725 ILCS 5/103-5(a) (West 2020)).

¶ 35    Although defendant was not tried for more than 18 months after being charged, the vast majority of the delay was due to the COVID-19 pandemic. Defendant was charged on January 9, 2020. On January 16, 2020, his public defender filed a written speedy trial demand. Defendant was

11

arraigned on February 13, 2020. The record shows that on March 9, 2020, the case was continued to May 4, 2020, on defendant's motion. On March 11, 2020, and again on March 31, 2020, defendant filed *pro se* speedy trial demands.

¶ 36    On March 23, 2020, however, the chief circuit judge entered Administrative Order 2020-M-10, pursuant to the Illinois Supreme Court's Order M.R. 30370, suspending court operations due to the COVID-19 pandemic. Ill. S. Ct., M.R. 30370 (eff. Mar. 20, 2020). Thereafter, the statutory speedy-trial term was tolled by various administrative orders related to the pandemic.

¶ 37    On September 24, 2020, defendant filed another *pro se* speedy trial demand. On November 16, 2020, the circuit court cancelled all hearings due to a COVID-19 surge. The closure continued through February 2021. Per Administrative Order 2021-M-3, the circuit court allowed the resumption of jury trials effective March 1, 2021, but provided that speedy-trial terms would continue to be tolled.

¶ 38    Despite the COVID-19 closure, the circuit court heard counsel's motion to withdraw and defendant's motion to proceed *pro se* on February 10, 2021. The hearing on counsel's second motion to withdraw was held on April 28, 2021. Defendant's jury trial began on May 18, 2021.

¶ 39    Thus, between the date defendant was charged on January 9, 2020, and March 23, 2020, the day the circuit suspended operations due to the pandemic, only 74 days elapsed. Up to the date of trial, the Third Judicial Circuit entered orders which, even if allowing the resumption of criminal jury trials, nonetheless tolled the statutory speedy-trial term.

¶ 40    The supreme court subsequently held that such circuit court orders entered pursuant to its COVID-19 order properly tolled any statutory speedy-trial terms. *People v. Mayfield*, 2023 Il 128092, ¶ 36. Because the bulk of the speedy-trial term was tolled due to the pandemic, and only 74 days elapsed prior to the pandemic closure, there was no meritorious argument in this regard

that appellate counsel could have made on direct appeal. Therefore, his postconviction claim lacks arguable merit.

¶ 41 Defendant's final claim contends counsel was ineffective for failing to raise a claim of mutual combat. "Mutual combat is defined as 'a fight or struggle entered into by both parties willingly or a mutual fight upon a sudden quarrel and in hot blood upon equal terms where death results from the combat.' " *People v. Jones*, 371 Ill. App. 3d 303, 309 (2007) (quoting *People v. Rivera*, 255 Ill. App. 3d 1015, 1026 (1993)). "The evidence must show the confrontation was mutual and both parties participated in the fight." *Id.* "Mutual combat does not apply where the defendant's retaliation was out of all proportion to the provocation, especially where the defendant used a deadly weapon to commit the homicide." *Id.*

¶ 42 The record contains no evidence that defendant and Jason were engaged in mutual combat and the petition is equally devoid of supporting evidence. Defendant testified that, while upstairs, he heard a noise on the stairs, saw a gun, and, overcome by fear, started shooting. Thus, counsel cannot be faulted for failing to pursue a defense that was unsupported by any evidence and would have directly contradicted his client's testimony. Accordingly, we agree this claim was also meritless.

¶ 43                                  CONCLUSION

¶ 44 As this appeal presents no issue of arguable merit, we grant OSAD leave to withdraw and affirm the circuit court's judgment.

¶ 45 Motion granted; judgment affirmed.